**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

PETER ELI ADAMS,                          *

      Petitioner,                      *

v.                                                           Case No.: GJH-18-2320

                                           *

WARDEN RICHARD DOVEY, *ET AL.*,

                                           *

      Respondents.                   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Peter Eli Adams, an inmate confined at the Maryland Correctional Training Center in Hagerstown, Maryland, seeks to attack his 2004 convictions for first-degree murder and use of a handgun in the commission of a crime of violence arising from the shooting of James Todd Piche.  ECF No. 1. In a limited answer, Respondents argue that the Petition is time-barred. ECF No. 4. Adams asserts that his claim is not time-barred because he has presented a claim of actual innocence. ECF No. 8; ECF No. 9. Respondents were directed to supplement the record, ECF No. 10, which they have done by filing a supplemental response to the Petition, ECF No. 11. Adams has replied. ECF No. 12. After reviewing these papers, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. § 2254(e)(2). For reasons set forth herein, the Petition is DENIED and DISMISSED.

## I.    Procedural History

In May of 2002, after a jury trial in the Circuit Court for Baltimore City, Adams was convicted of first-degree murder and a related handgun offense. ECF No. 4-1 at 4, 6. Adams was

sentenced on September 28, 2004, to life imprisonment for the first-degree murder and a 20-year consecutive term for the handgun offense. *Id*. at 4, 8. Both sentences were to run consecutive to any then outstanding unserved sentence. *Id*.

Adams filed Motions for New Trial, which were denied, after hearings. ECF No. 4-1 at 6–8. He also noted a timely appeal and on November 3, 2005, the Court of Special Appeals of Maryland affirmed Adams's conviction. *Adams v. State*, 165 Md. App. 352, 366, 439, 885 A.2d 833, 841, 883 (2005). Thereafter Adams filed a petition for writ of certiorari to the Court of Appeals of Maryland, which was denied on March 10, 2006. *See Adams v. State,* 391 Md. 577, 894 A.2d 545 (2006); ECF No. 4-1 at 9. He did not seek further review in the United States Supreme Court and his time for doing so expired on June 8, 2006. *See* Supreme Ct. R. 13.1 (time for filing petition expires ninety days after entry of the order sought to be appealed).

On December 3, 2009, Adams filed an application for post-conviction relief in the circuit court.  ECF No. 4-1 at 9. While the post-conviction petition was pending, on October 18, 2011, Adams filed a motion to correct an illegal sentence which the court held *sub curia* pending the resolution of the post-conviction petition. *Id.* at 12–13. On January 18, 2017, after holding hearings on the post-conviction petition, the circuit court denied post-conviction relief. *Id.* at 13. While Adams's timely application for leave to appeal the denial of post-conviction relief was pending in the Court of Special Appeals, the circuit court denied, on August 1, 2017, Adams's motion to correct illegal sentence. *Id*. at 14. Adams did not file an appeal.

On August 29, 2017, the Court of Special Appeals summarily denied Adams's application for leave to appeal the denial of post-conviction relief. ECF No. 4-1 at 20–21. Adams's motion for reconsideration was denied on November 7, 2017. *Id*. at 22–23. Adams filed an unauthorized petition for writ of certiorari in the Maryland Court of Appeals, which was

denied on January 19, 2018. *Id*. at 24; *see* Md. Code, Cts. & Jud. Proc. § 12-202(1); *Stachowski v. State*, 416 Md. 276, 288–94 (2010), 6 A.3d 907, 913–17 (Md. 2010) (holding that the Court of Appeals lacks jurisdiction to grant certiorari where Court of Special Appeals summarily denies application for leave to appeal in a post-conviction case).

Adams's Petition was filed on June 27, 2018. ECF No. 1; *see Houston v. Lack*, 487 U.S. 266, 270 (1988). On October 2, 2018, Respondents filed a limited answer, arguing that the Petition is time-barred and should be dismissed on that basis. ECF No. 4. The Court issued an Order on October 3, 2018, granting Adams twenty-eight days to file a response addressing the timeliness issue. ECF No. 5. On October 19, 2018, the Court received Adams's reply, ECF No. 8, and his request to amend the Petition to assert his claim of actual innocence along with the affidavit of trial witness Leon Wilkerson, ECF No. 9. The Court then directed Respondents to supplement the record and address Adams's actual innocence claim. ECF No. 10.

Respondents supplemented the record as directed and also filed a supplemental response to the Petition reiterating their claim that the Petition is time-barred and that Adams has failed to demonstrate that it is more likely than not that no reasonable juror would have convicted Adams in light of the new evidence. ECF No. 11 at 2; *see also McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Respondents argue that Adams therefore does not qualify for the actual innocence exception to the statute of limitations recognized in *Perkins*. ECF No. 11 at 12. Petitioner has replied.  ECF No. 12.

**II.    Background**

Adams's claims center on the shifting testimony of trial witness Leon Wilkerson and the alleged failure of the State to disclose favorable material evidence.

**A.  Wilkerson's Pretrial Statements**

Wilkerson was the only eyewitness to Piche's murder who testified at trial. The Court of Special Appeals described Wilkerson's initial statement to police, which inculpated Adams in the murder, as follows:

> Between 4:55 P.M. and 5:14 P.M. on November 14, 2001, in the office of Detective Sergeant John Barrick of the Baltimore City Police Department Homicide Unit, Leon Wilkerson gave a statement to Detective Joe Phelps, in the presence of Detective Tom Martin, about the Adams case. The statement was tape-recorded as it was given. The recording was subsequently transcribed by Myrna C. Milburn, of the Administrative Unit of the Criminal Investigation Division, on December 17, 2001. The transcript ran to ten pages.
>
> In that tape-recorded statement, Wilkerson described the circumstances surrounding a fatal shooting that occurred on the evening of December 16, 1998, three years earlier. He unequivocally identified Adams, a known acquaintance of his, as the shooter. He further described how Adams, after the shooting, "ran down Alhambra" Avenue, "down through the alley," and "to my baby's mother's house" at 5206 Craig Avenue.

165 Md. App. at 366.

Thereafter, but prior to the beginning of Adams's trial, Wilkerson twice wrote to Adams to reassure him regarding his testimony. The Court of Special Appeals quoted the letters in their opinion as follows:

> You or nobody else ever have to worry about me taking the stand and telling. I will never go against the code and that's everything I love. Trust me and take my word on it. They don't have anything on you . . . . You will never have to worry about me testifying. That's against my code. You don't have nothing to worry about.

>             \* \* \*

> This is the bad news. They is making me take the stand. The good news is they question me again about the bullshit and this is what I said . . . . I saw a person walking down from Ivanhoe with a gun, snowsuit, mask, and dreads. They ask me did I see any faces. I told them no and I wasn't sure who it was. Then I told them it could've been anybody around there because it's about 5 people with dreads . . . . After the shooting you was there in the room with Tia with your boxer shorts and T-shirt on. Feel me. It was no way you could've done all this in that short time.

>             \* \* \*

> Don't worry, my nigga. I was never going to take the stand on you in the first place.
> I'm going to make it my business that you see the streets.

165 Md. App. at 376 (emphasis omitted).

Wilkerson also wrote to his own attorney, Daniel Marcus, before the trial, wherein he
discussed his upcoming testimony at Adams's trial and at another murder trial involving three
defendants (referred to in the record as the "Poole" or "Von Poole" case(s)). The Court of
Special Appeals also quoted this letter:

> I know I'm suppose to testify sometime next month in 2 cases. The cases that
> starts on the 7th of next month [the Poole cases] is the only case that the deal was
> suppose to be made with or for. . . . The case on the 16th of next month [the
> Adams case] was only to assure me a bail which they fail to give me . . . . [That]
> case I'm not sure about . . . . [T]he case on the 16th I'm not sure because I really
> didn't eyewitness him do anything. . . . [P]lease let them know my deal was only
> made to testify in the case on the 7th for both of my charges to be drop.

165. Md. App. at 401 (emphasis omitted).

### B.  Testimony at Trial

Adams's trial began on May 21, 2002, in the Circuit Court for Baltimore City, the
Honorable  Kaye A. Allison presiding.  ECF No. 11-2. In defense counsel's opening statement,
he argued that Wilkerson was not to be trusted because he was a convicted felon facing 25 years
without parole and because he was seeking favor with law enforcement. Counsel referenced both
the letter Wilkerson sent to his attorney saying he did not see anything and the letter Wilkerson
sent to Adams in which he claimed that he only identified Adams in order to make bail. *Id.* at
22–23.

Wilkerson was the first witness called to testify. The post-conviction court summarized
his testimony as follows:

> James Todd Piche was shot and killed while parked in his pickup truck at the corner
> of McCabe and Alhambra Avenues in Baltimore City on December 16, 1998. Piche
> suffered gunshot wounds to the left side of his head, the back of his head, and his

chin from shots fired at close range. Police detectives were unable to identify any suspects until Lloyd Jarrett approached detectives in January 1999 and identified Petitioner Peter Eli Adams as the shooter. Jarrett did not witness the shooting. He identified [Adams] based on [Adams's] own statements to him about the shooting. Almost three years later, in November 2001, Leon Wilkerson gave police a recorded statement. Wilkerson witnessed the shooting and identified [Adams] as the shooter. Wilkerson's account was generally consistent with the information provided in 1999 by Jarrett. [Adams] was then arrested and charged with first-degree murder.

\* \* \*

At [Adams's] trial, Wilkerson and Jarrett testified that [Adams], his brothers, and several other men from the neighborhood frequented the corner of McCabe and Alhambra Avenues in 1998. The group, called the "McCabe Boys," had gang ties and distributed drugs. Transcript ("Tr.") (5/21/02) at 162. Wilkerson and Jarrett, who are cousins, both participated in these activities to some extent.

Wilkerson testified that [Adams] was selling crack cocaine at the corner of McCabe and Alhambra Avenues on the evening of December 16, 1998. *Id.* at 29. Wilkerson and at least two other people, including Wayne England, were present on the corner. *Id.* at 68- 69. Wilkerson was also selling drugs that evening. *Id.* at 68. A white male driving a pickup truck, later identified as Piche, pulled up to the corner after approaching from Glenwood Avenue. *Id.* at 31. [Adams] approached the truck, presumably to sell drugs to Piche. After a few minutes, [Adams] returned to the group and said, "He got me." *Id.* at 35–36. [Adams] showed the group a one-dollar bill with cutoff, twenty-dollar corners or edges taped to the one-dollar bill. Wilkerson testified he believed the driver had cheated [Adams] by using this fake money to purchase drugs. *Id.* at 37–38. [Adams] was "laughing it off " and left the corner, saying he would be back. *Id.* at 38. [Adams] also said he was going to get his gun. *Id.* at 95–96.

Piche returned to the corner in his truck about ten minutes later. *Id.* at 101. Piche was driving erratically and bumped his wheels up on the curb or sidewalk as he stopped. *Id.* at 50–51. At the time, [Adams] had not yet returned to the corner. Wilkerson was standing about three houses down from the corner with his girlfriend. *Id.* at 83–84, 97. Wayne England approached the truck and talked to Piche. *Id.* at 102. England then left the truck, walked up to where Wilkerson was standing with his girlfriend, and told Wilkerson he should get his girlfriend out of there. *Id.* at 102–04. The girlfriend left, and Wilkerson and England remained there. *Id.* at 105, 111. During this conversation, Piche remained sitting in his truck at the corner for several minutes. *Id.* at 107–09. Wilkerson believed that Piche was waiting to be served drugs. *Id.* at 109.

Wilkerson testified that the shooter approached the truck on foot and fired without any interaction with Piche. *Id.* at 39, 97–98, 101–02. "[H]e just start shooting." *Id.*

at 101. The shooter fired from the middle of the street into the driver's side of the truck. *Id.* at 101–02. Wilkerson remembered approximately four or five gunshots. *Id.* at 52–53. The shooter then fled down Alhambra Avenue and into an alley. *Id.* at 109–10.

At trial, Wilkerson tried to avoid giving a definitive identification of [Adams] as the shooter. He testified that the shooter approached the vehicle wearing a one-piece, "Army fatigue" snowsuit with an "Army fatigue" mask covering his face. *Id.* at 70–71; *see also id.* at 54.[3] Wilkerson described the shooter as having dreadlocks, like [Adams's], but he testified there were a number of people in the area who also had dreadlocks. *Id.* at 71. He gave the following testimony:

> Q. And then you saw Peter Adams shoot and kill Todd Piche, is that correct?
>
> A. I seen a person with a mask on do it.
>
> Q. The Defendant you say was wearing a mask, is that right?
>
> A. Yes, yes.
>
> Q. But it was Peter Adams, is that correct?
>
> A. I mean, I don't know if it was exactly him because the person was wearing a mask. All I noticed was dreadlocks.
>
> Q. Okay. And he has dreadlocks, is that correct?
>
> A. Yes.

*Id.* at 54. Later, Wilkerson testified:

> Q. Now in that statement [given in November 2001] you told the truth, is that correct?
>
> A. Yes.
>
> Q. And the truth was that you saw the Defendant shoot the white man in the truck, is that right?
>
> A. Yes.
>
> Q. All right. And you're not changing that today, is that correct?
>
> A. I didn't see his face. I seen a person with dreads.
>
> Q. But you knew it was him though, right?

A. I assumed it was him. I mean, from the dreads.

Q. Okay. But back in November 2001 you actually said it was the Defendant, is that right?

A. Yes. Yes.

*Id.* at 94–95. The statement referred to was Wilkerson's recorded statement given to the police in November 2001, parts of which were played for the jury. *Id.* at 41–45. Wilkerson freely acknowledged that he positively identified [Adams] as the shooter in that statement. *Id.* at 43. In the recorded statement, Wilkerson said:

Guy came around there to purchase some drugs (inaudible). He must of gave him some fake money or something because when he pulled off Peter was like, he got me. He got me. So, (inaudible). The truck come right back and (inaudible) and everything. So, somebody called Peter and told Peter that (inaudible) came back and he shot him right—between Alhambra (inaudible).

*Id.* at 44–45.

Wilkerson's effort to qualify his identification of [Adams] at trial was inconsistent. In one segment of testimony, he identified [Adams] as the shooter without reservation:

Q. And it was Mr. Adams that did that [ran down an alley], is that correct?

A. Yes.

Q. Okay. And this was the same person that just shot the man in the pickup truck, is that right?

A. Yes.

\* \* \*

Q. A moment ago you just said that you didn't see Peter Adams do the shooting, do you remember that?

A. Yes.

Q. Do you remember saying that to them?

A. Yes.

Q. And now when we review your taped statement—

A. Yes.

Q. And when you explained to the jury in detail about where he ran after he did the shooting—

A. Yes.

Q. —you've indicated that it was Peter Adams, is that correct?

A. Yes.

* * *

Q. You were telling the truth back in November, is that right?

A. Yes.

*Id.* at 47, 49, 50.

Wilkerson was questioned at length at trial both by the Assistant State's Attorney and by [Adams's] trial counsel about the circumstances of both his November 2001 statement to the police and his trial testimony. Both parties questioned him about three letters he wrote—two of them to [Adams] and one to his own defense lawyer—in which he discussed his statement and/or his testimony to be given in the case. *Id.* at 57, 65, 75–77. Wilkerson acknowledged that he had two drug cases pending against him in November 2001 when he made the statement to the police. *Id.* at 55, 72–73. He was angry with [Adams] because he thought [Adams] would help him post bail in the more serious case and was not helping him. *Id.* at 56–57, 73–74. He made the statement in part because he was angry at [Adams] and in part because he thought the police would help him get a more affordable bail, although he admitted the police had made no promises to him. *Id.* at 74–75, 100–01. In the letters to [Adams], Wilkerson gave convoluted explanations including that his anger toward [Adams] was based on rumors about things [Adams] had done, that his plan had been to use the statement to get bail and then to disappear or avoid being called as a witness, that he remained loyal to [Adams], and that he did not intend to go against "that code." *Id.* at 60–61, 65–66, 78–79, 86–87, 92–93. [Adams's] trial counsel also sought to suggest that Wilkerson expected leniency in cases still pending against him in exchange for testifying against [Adams]. *Id.* at 79, 82–83. Wilkerson acknowledged that one of the cases against him included a potential mandatory minimum sentence of twenty-five years' incarceration without the possibility of parole. *Id.* at 79.

_____

[8] Wilkerson testified that, when Petitioner was on the corner earlier in the evening, Petitioner was wearing a leather jacket, jeans, and a hat with his dreadlocks on the side of the hat. *Id.* at 90.

ECF No. 11-1 at 12–18 (some footnotes omitted).

Next, Lloyd Jarrett testified that he grew up with Adams in the neighborhood. ECF No. 11-2 at 126. When he arrived in the area of McCabe and Alhambra the night of the shooting no one was out on the streets, which was unusual. *Id*. at 128. He testified that he knew that Adams sold drugs on that corner every day. *Id*. at 131. He was told by two separate people that no one was out in the neighborhood that night because someone got killed. *Id*. at 132–33. He left and came back to the neighborhood two days later. *Id*. at 133. At that time, a group of men, including Adams, were on the corner of McCabe and Alhambra. Jarrett spoke with Adams about the shooting a few nights earlier. Adams told Jarrett that he had shot Piche, who was then identified to Jarrett as just a drunk white man, because the man had stolen drugs from Adams by using fake money to pay for them. *Id*. at 133–34. Adams said that, after the man stole drugs from him, he later returned and did not seem to recognize that Adams was the same person that he had stolen from before. *Id*.

According to Jarrett, Adams then told "Wayne," another man at the scene, to delay the man and keep him from leaving while Adams went to get the "burner"—meaning his gun. ECF No. 11-2 at 135. Adams returned and "burned him up" by shooting him twice in the head. *Id*. at 136. Jarrett also testified that Adams recounted that the victim was driving a pickup truck and told the story to Jarrett in a bragging manner. *Id*.

Detective Joe Phelps, the lead investigator, testified on the second day of trial. ECF No. 11-3 at 17. He described the crime scene and testified that no fingerprints were recovered from shell casings or the truck. *Id*. at 43. Door to door canvas of the neighborhood also did not turn up anything. *Id*. at 46. Then, in January of 1999, Jarrett, who did not ask any favors, came to the police and identified Adams as the shooter. *Id*. at 47. Adams was not arrested at that time

because Jarrett did not witness the murder and his testimony was not sufficient to issue a warrant. *Id.* at 48. As a result of Jarrett's information, the police recanvassed the area and interviewed Wayne England, who indicated that he and Adams were present at the time of the shooting but did not implicate Adams in the shooting or say he had spoken to the victim. *Id.* at 51.

Police were able to obtain an arrest warrant for Adams after interviewing Wilkerson. ECF No. 11-3 at 53. After police received information from Wilkerson, they verified his account with the crime scene. They confirmed that the victim's blood alcohol level was .16 which is above the legal limit for intoxication and that the victim had recently ingested cocaine. *Id.* at 55. That information had not been shared with Jarrett or Wilkerson. *Id.* at 56.

The defense called Makeba Graham as an alibi witness. ECF No. 11-3 at 80. She recalled being at Adams's house the morning of the homicide and that they ran errands, including driving to Baltimore City Community College so that she could drop a class. *Id.* at 83–84. They returned to the house around lunchtime. *Id.* at 84. Around 5 p.m., Adams's sister, Angela Boyd, came to pick up her children from the house. *Id.* at 85. There was commotion outside the house when Angela was getting ready to leave. *Id.* at 86. Graham testified that the commotion was because neighbors were saying that a "guy had got killed down the street" but that Adams was sitting with her in the living room the entire time. *Id.*

During cross-examination, Graham was impeached regarding her recollection of the time of year she recalled being with Adams and her testimony that Adams went to school with her to drop a class. Graham had not been enrolled in school since March of 1999.[1] *Id.* at 90.

---

[1] Subsequently, the custodian of records for Baltimore City Community College authenticated Graham's transcript that showed she last attended school on December 13, 1997, the year before the murder, and withdrew from a speech class in the Fall of 1996.  ECF No. 11-4 at 25, 28.

The defense also called Angela Boyd as an alibi witness. ECF No. 11-3 at 114. She testified that on the day of the murder she got to her mother's house around 5:30 p.m. to pick up her children, and Adams's mother had prepared dinner. *Id.* at 117–18. They all ate dinner at the house, including Adams. *Id.* at 118. Boyd heard noise outside while eating dinner and when she went to the door, a crowd of people were all outside saying that a white guy had been killed. *Id.* at 118–19.

Adams's mother, Koreen Adams, also testified as an alibi witness. ECF No. 11-3 at 136. She confirmed that Graham was at the house that day and that she and Adams went driving around together. *Id.* at 141–42. They were back in time to pick up the children from school and they all stayed for dinner. *Id.* at 143–144. Koreen Adams testified that Adams was playing with the kids when they heard noise outside, saw neighbors gathered, and heard that someone had been killed down the street. *Id.* at 145–47.

### C.  Wilkerson's Testimony at Motion for New Trial Hearing

In his Motion for New Trial, Adams claimed, among other things, that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose a promise to Wilkerson of leniency in his pending narcotics case in exchange for his testimony. At the hearing, Wilkerson claimed that he had given false information to the police regarding Adams's involvement in the homicide to "pay him back" because at that time "[he] and Mr. Adams. . . were going through a little disagreement."  ECF No. 11-5 at 63. Wilkerson also testified that after speaking to police he believed that if he did not help them, "they was going to give me 25 [years], no parole." *Id.* at 64. Wilkerson also claimed that Detective Phelps told him that "if [he] can help him with a homicide, he'll see if he can get a deal worked out[.]" *Id.* at 59.

12

Detective Phelps denied offering Wilkerson a deal, and specifically testified that he never offered Wilkerson anything in exchange for his testimony and did not offer to speak to the State's Attorney regarding Wilkerson's pending cases. ECF No. 11-5 at 90–93, 113.

Wilkerson confirmed that no prosecutor made any promise to him and that his impression that he would receive leniency came from discussions with police. ECF No. 11-5 at 78–79. He also claimed, however, that in an interview with the prosecutor in Adams's case, Assistant State's Attorney Frank Rangoussis, that he told Rangoussis he "didn't see [Adams] do it" and "wasn't sure that [Adams] was the one who did the shooting," but Rangoussis stated, "If you don't go through with the case, you're the one facing 25 years." *Id.* at 65–66, 67.

Judge Lynn Stewart, who was the prosecutor in the Von Poole case prior to ascending to the bench, testified that she made no offers of leniency to Wilkerson as the prosecutor in that case. ECF No. 11-5 at 102. She further testified that she could not "recall any homicide case [she had] ever handled where [she] offered any witness anything to testify." *Id.*

The prosecutor in Wilkerson's pending case, Assistant States Attorney Melissa Copeland, testified that she was aware that Wilkerson was cooperating as a witness but neither Rangoussis or Stewart or any other prosecutor told her she should offer Wilkerson leniency. ECF No. 11-5 at 119–20, 128. She stated that she filed a notice of 25 year mandatory minimum at the beginning of Wilkerson's case as a matter of policy as she did in every case in which the defendant was eligible for a mandatory minimum sentence, but she never actually pursued a mandatory minimum in any of her cases and did not do so in Wilkerson's case. *Id.* at 130–31. Instead, she agreed to a plea and sentence of time served in Wilkerson's case because he had already served a year and the charges were not "the case[] of the century." *Id*. at 132–33. Rangoussis did not

13

advise her how Wilkerson testified during Adams's case, and Copeland testified that it would not have made any difference to her if he had. *Id*. at 133.

In rejecting Adams's request for a new trial, the court made the following findings:

22. State's Attorney Rangoussis never offered Leon Wilkerson leniency in exchange for his testimony in the Adams trial.

\* \* \*

29. State's Attorney Copeland was never told by any prosecutor that Leon Wilkerson had a deal with the State in exchange for his testimony and State's Attorney Copeland was not asked by any prosecutor to offer Leon Wilkerson leniency in exchange for his testimony in the Adams or Van Pool cases.

\* \* \*

52. No police officer, including Detective Phelps, offered Leon Wilkerson any leniency, or promised Leon Wilkerson anything in exchange for his testimony in the Adams case.

53. No police officer, including Detective Phelps, threatened Leon Wilkerson to force him to testify for the State in the trial of Peter Adams.

54. No prosecutor, including Frank Rangoussis, made a threat to Leon Wilkerson to coerce his testimony in the Peter Adams trial.

\* \* \*

56. State's Attorney Lynn Stewart made no offer to Leon Wilkerson in exchange for his testimony and did not promise him leniency in exchange for that testimony.

ECF No. 11-1 at 5–7.

The Court of Special Appeals affirmed Adams's conviction, including the denial of the motion for new trial and affirmed the trial judge's finding of facts regarding the motion for new trial as not clearly erroneous. 165 Md. App. at 393, 396, 397, 402, 405, 413, 414, 439. The Court of Special Appeals further found that threats made by prosecutors could not have induced Wilkerson's November 14, 2001 statement given to police inculpating Adams:

As of November 14, 2001, there was not yet in the State's Attorney's Office a file on the Adams case. Indictments in that case had not yet been considered, let

14

alone filed. Frank Rangoussis was not yet assigned to the prosecution of the Adams case, nor Melissa Copeland to the Wilkerson case. Lynn Stewart, prosecutor of the Poole cases, was totally unaware of a future Adams case or a future Wilkerson case. Neither the Public Defender's Office nor Daniel Marcus was yet involved in the representation of Wilkerson. No prosecutor or defense attorney was present at, or even aware of, Leon Wilkerson's statement to the police on that day.

The only possible parties to any conceivable deal or understanding that might have induced Wilkerson to make his statement to the police on November 14, 2001, were 1) Wilkerson himself and 2) Detective Joe Phelps. Phelps testified unequivocally that he never offered or promised Wilkerson anything, including any help in making bail. [The trial judge] expressly found Detective Phelps's testimony in that regard to have been truthful.

*Id.* at 415.

In Adams's post-conviction proceedings, Adams again claimed that the State violated *Brady* by failing to disclose that Assistant State's Attorney Rangoussis threatened Wilkerson with twenty-five years' incarceration if Wilkerson failed to testify against Adams. The court rejected the claim as foreclosed by the trial court's denial of the motion for new trial which was affirmed by the Court of Special Appeals:

. . . Petitioner contends that Mr. Rangoussis knew he threatened Wilkerson with twenty-five years' incarceration if Wilkerson did not testify against [Adams] and that Mr. Rangoussis then failed to correct Wilkerson's testimony that no threats, deals, or promises were made in exchange for Wilkerson's testimony. [Adams] contends that Mr. Rangoussis violated *Brady* by failing to turn over evidence of his alleged "threat" of twenty-five years of incarceration to the defense.

This claim fails [because] the Court of Special Appeals has determined conclusively that the State did not obtain Wilkerson's testimony by threats of incarceration or expectations of leniency. [Adams's] claim for post-conviction relief on this ground will be denied.

ECF No. 11-1 at 61.

### D. Newly Discovered Evidence

In support of his Petition in this Court, Adams has submitted Leon Wilkerson's affidavit. ECF No. 9-1 (Wilkerson Affidavit). Wilkerson avers that the "person who committed the

shooting was Darnell Powell, not Peter Adams" and that a detective and prosecutor threatened

him with a lengthy sentence regarding a drug distribution charge unless he testified against

Adams. *Id.* at 1–2. In Wilkerson's Affidavit, dated June 6, 2020 and executed 19 years after

Wilkerson's initial statement to police, he avers:

> On December 16, 1998, I was in the vicinity of a shooting which occurred at Alhambra and McCabe Avenue in Baltimore City. There were several people present at the time of the shooting. The victim appeared to be buying drugs from an unknown drug dealer, and then the drug dealer walked away, and two other men approached the victim. One of these men was Darrell Powell. It appeared that the two men were attempting to rob the victim. None of these men were Peter Adams. Peter Adams was not present at the scene. Darrell Powell shot the victim, and then he and the other man ran into 734 McCabe Avenue.
>
> The person who committed the shooting was Darrell Powell, not Peter Adams. I know Peter Adams, and he was definitely not one of the people who committed this crime. Shortly after the shooting, the police arrested me for drug distribution. When they found out what area I was from, they told me to say that Peter Adams committed this murder. I told Detective Phelps that Peter Adams did not do it. He then told me to say that Peter Adams was the shooter, and that if I told them this, they would let me go, but that if I continued to say that Peter Adams did not do it, then I would go to jail for 25 years without the possibility of parole. Under the pressure of the police interrogation, I then made a statement with the hope that they would let me go, which I later recanted. I wrote a letter to my attorney, indicating that Peter Adams did not commit this crime. Two or three days before Mr. Adams' trial, Det. Phelps took me to the State's Attorney's Office, where he and Assistant State's Attorney Rangoussis [sic] again threatened me with a sentence of 25 years without parole if I did not testify against Peter Adams.

ECF No. 9-1 at 1–2.

## III.   Claims in this Petition

In the pending Petition, Adams states ten grounds for relief, the first seven include claims

that the State withheld favorable material evidence in violation of *Brady v. Maryland*, 373 U.S.

83 (1963). The grounds, as summarized by Respondents, follow:

> *Ground One*: That the State did not disclose information given by a witness named Thomas Smith, indicating that "the perpetrators ran into 734 Mc[C]abe [A]ve. after . . . shooting the victim." Adams claims this information would have contradicted a statement from Leon Wilkerson, the State's key witness, that after the shooting

Adams "ran down an [alley], and into 5206 Craig Ave, which is (2) blocks in the opposite direction of 734 McCabe Ave. (ECF 1 at 6-7; *see also* ECF 1-1 at 6).

*Ground Two*: That the State did not disclose that a police officer, Sergeant Barrick, "received information from a source" giving an account of the murder that Adams claims "contradicts the state's witness testimony that [Adams], who was the [victim's] alleged [drug] dealer, shot the victim." (ECF 1 at 7).

*Ground Three*: That the State did not disclose a note dated March 25, 1999, made by the lead investigator, Detective Phelps, containing "information from a female source about 'Rodney and Fred,'" two alleged witnesses to the murder whose alleged accounts, Adams claims, "point[ ] to someone other than [Adams] as perpetrator." (ECF 1 at 7).

*Ground Four*: That the State did not disclose another note made by Detective Phelps, indicating that the victim's girlfriend, Mary Dunn, told him the victim had cashed a $1,000 check on the morning of the homicide. Adams claims that this information contradicts the State's theory of the case (that Adams killed the victim for ripping him off in a drug deal) and instead supports a theory that the victim was killed in a robbery. (ECF 1 at 8).

*Ground Five*: That the State did not disclose a third note made by Detective Phelps stating that Wilkerson, the sole testifying eyewitness, had told police that he had previously seen the victim in the neighborhood and that the victim worked at BWI Airport with Wilkerson's mother—information that Adams claims could have been used to impeach Wilkerson. (ECF 1 at 8).

*Ground Six*: That the State did not disclose the name and address of a possible eyewitness, Eugene Cartwright. (ECF 1 at 8).

*Ground Seven*: That the State did not disclose an alleged inducement to Wilkerson to testify. Specifically, Adams claims that, at the January 21, 2003 hearing on Adams's second amended motion for new trial, Wilkerson testified that two days before Adams's trial, the trial prosecutor, Baltimore City Assistant State's Attorney Frank Rangoussis, had "threatened Wilkerson with 25-years no-parole if he did not go through with his perjured testimony against [Adams]." (ECF 1 at 9).

*Ground Eight*: That the State allegedly "suborned, knowingly used and/or failed to correct perjured testimony" by Wilkerson. In support, Adams relies on evidence that Wilkerson had told his attorney, Daniel Marcus, and ASA Rangoussis before trial that "he didn't really eyewitness [Adams] do anything." (ECF 1 at 9).

*Ground Nine*: That the jury was not instructed on second-degree murder as a lesser-included offense of first-degree murder. (ECF 1 at 9-10).

> *Ground Ten*: That the State violated the Confrontation Clause at trial when it elicited hearsay testimony from Detective Phelps that Wayne England, an individual who did not testify at trial and did not give a written or recorded statement, had "'told' him that [Adams] was on the same corner of the shooting at the time of the shooting[.]" (ECF 1 at 10).

ECF No. 4 at 9–11.

As noted, Adams further alleges that he is actually innocent of the murder of James Piche. ECF No. 9. In support of his actual innocence claim, he relies on the claims stated above as well as the affidavit of Leon Wilkerson. *See* ECF No. 1; ECF No. 9-1.

## IV.   Timeliness

The threshold issue in this case is the timeliness of the petition. Only if the petition is timely or its untimeliness is excused may the Court reach the merits of Adams's claims.

A one-year statute of limitations applies to habeas petitions in non-capital cases for persons convicted in state court. *See* 28 U.S.C. § 2244(d)(1); *Wall v. Kholi*, 562 U.S. 545, 550 (2011). The one-year period of limitation applies to the entire § 2254 petition, on a claim-by-claim basis. *See Pace v. Diguglielmo*, 544 U.S. 408, 416 n.6 (2005). Section 2244(d)(1) provides that:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to

cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Under both § 2244(d)(1)(A) and § 2244(d)(1)(D), Adams's petition is untimely as it was filed in this Court more than one year after his judgment became final and he has not demonstrated the requisite due diligence under § 2244(d)(1)(D) for a later starting date of the limitations period.

### A. Statutory Tolling

Pursuant to Section 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C.§ 2244(d)(2).

This one-year period is, however, tolled while properly filed post-conviction proceedings are pending. 28 U.S.C. § 2244(d)(2); *Harris v. Hutchinson,* 209 F.3d 325, 328 (4th Cir. 2000); *Hernandez v. Caldwell*, 225 F. 3d 435, 439 (4th Cir. 2000).

Adams had nothing pending in state court which would have served to toll the limitations period from June 8, 2006, the date when his conviction became final, until December 3, 2009, when he initiated state post-conviction proceedings. Therefore, the federal limitations period for filing his federal habeas petition expired years before he began to pursue his state court post-conviction remedies.

Adams contends the petition is timely. He argues that the State withheld material, exculpatory information in violation of its obligations under *Brady*, which was found in police investigatory files produced for him on December 17, 2009, in response to his Maryland Public

Information Act ("MPIA") request. *See* ECF No. 8. He asserts that he first learned of the information contained in claims one through six, which he characterizes as newly discovered evidence, rendering the date of this discovery the operative date to trigger the running of the one-year limitations period under 28 U.S.C. § 2244(d)(1)(D). *Id.* at 2.

To the extent Adams claims that newly discovered evidence reset the limitations period pursuant to 28 U.S.C. § 2244(d)(1)(D), such an argument plainly does not apply to Grounds 7, 8, 9 and 10. Ground 7 concerns Wilkerson's testimony at the January 21, 2003 hearing on Adams's second amended motion for new trial asserting prosecutors told him prior to trial that Wilkerson would face a harsh sentence if he did not testify against Adams. Adams therefore knew of this claim at the time of the hearing, both before his direct appeal was concluded and before he filed post- conviction proceedings. The factual predicate of this claim was not first discovered in the review of the police investigatory file. As the information was known to Adams before his conviction became final on June 8, 2006, his ability to raise this claim expired one year later when the limitations period elapsed. No other starting date applies to this claim and Adams is not otherwise entitled to statutory tolling.

Ground 8 concerns Adams's allegation that the State used "perjured testimony" from Wilkerson at trial and is based in part on a letter from Wilkerson to Wilkerson's trial attorney wherein Wilkerson claimed that he "didn't really eyewitness [Adams] do anything" *Adams v. State*, 165 Md. App at 401. The letter was entered into evidence at the hearing on Adams's motion for new trial. *Id*. Adams also relies on testimony from Wilkerson offered at the same hearing where Wilkerson claimed that he told Adams's prosecuting attorney that he had not witnessed Adams commit the murder. ECF No. 1 at 9. Neither of the facts supporting Ground 8 came from the police investigatory files. The information was available to Adams before the

limitations began to run on June 8, 2006, and the claim is time-barred.

Ground 9 concerns a jury instruction on second-degree murder and is based solely on trial court error. Again, this claim has nothing to do with facts allegedly uncovered by discovery contained in the police investigatory file. The claim was known to Adams at the time of his trial, accrued prior to the commencement of the limitations period, and is not otherwise entitled to statutory tolling. The claim is time-barred.

Ground 10 concerns Adams's claims that the State breached his rights under the Confrontation Clause by eliciting hearsay testimony at trial. Again, this claim is unrelated to any facts uncovered by the discovery of the police investigatory file. It was known to Adams during trial, and therefore the claim accrued prior to the commencement of the limitations period. The claim is time-barred and not otherwise entitled to statutory tolling.

As to Adams's *Brady* claims raised in Grounds 1 to 6, they are also time-barred. Adams claims that he did not discover this evidence until seven and a half years after his trial and therefore his claims are timely. *See* ECF No. 1 at 6. [2]

A *Brady* violation could trigger a later start of the limitations period under Section 2244(d)(1)(D) where a state suppresses evidence so that a petitioner could not "discover[] through the exercise of due diligence" the "factual predicate of the claim or claims presented" until after the convictions became final. 28 U.S.C. § 2244(d)(1)(D). However, that is not the case here.

Adams alleges that when he received the homicide file on December 17, 2009, in response to his MPIA request, he first learned of the information contained in claims one through

---

[2] Adams discovered the information while his state post-conviction petition was pending and amended his petition to include those claims, which the post-conviction court reviewed and subsequently rejected.

six, which he characterizes as "newly discovered evidence." ECF No. 8 at 2. Under Section 2244(d)(1)(D) the limitations period begins to run for newly discovered evidence "when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognized their legal significance." *Hasa v. Galaza*, 254 F.3d 1150, 1154 n.3 (9th Cir. 2001). "[T]he petitioner bears the burden of proving that he exercised due diligence, in order for the statute of limitations to begin running from the date he discovered the factual predicate of his claim pursuant to 28 U.S.C. § 2244(d)(1)(D)." *DiCenzi v. Rose,* 452 F.3d 465, 471 (6th Cir. 2006). To be entitled to the later starting date of the statute of limitations, the petitioner must explain why a reasonable investigation would not have uncovered the facts before the date under which the limitations period commenced under 28 U.S.C. § 2244(d)(1)(A). *In re Boshears*, 110 F.3d 1538, 1540–41 (11th Cir. 1997). A petitioner who simply "alleges that [he or she] did not actually know the facts underlying his or her claim does not" demonstrate the requisite due diligence. *Id*. at 1540.

Adams has not shown the requisite diligence to trigger this alternative date for the running of the limitations period. In his application for leave to appeal the denial of post-conviction relief, Adams submitted as an exhibit the first page of a letter from the Baltimore Police Department, dated December 17, 2009, which was written in response to his MPIA request. ECF No. 4-1 at 25. The cover page itemized the contents of the Police Department investigatory file that the MPIA request produced. *Id.* The exhibit does not indicate when Adams made his request under the MPIA. Adams supplements in his Reply that, in April of 2009, nearly three years after his conviction became final, he began corresponding with the Baltimore Police Department to obtain his homicide files. *See* ECF No. 8-1, Ex. 13. Adams fails to explain why he could not have filed the MPIA request sooner so as to have obtained, or at least requested, the

investigatory file within one year of the date his convictions became final.[3] Adams must explain how a reasonable investigation would not have unearthed the alleged *Brady* evidence. This he fails to do.

Simply stated, Adams does not offer any explanation for the delay in his filing the MPIA request and therefore has not shown the requisite diligence necessary under the statute. Thus, he cannot invoke Section 2244(d)(1)(D) as the triggering provision for the timing of these proceedings. Petitioner fails to suggest, and the Court cannot identify, any alternative reading of 28 U.S.C. § 2244(d)(l)(A)-(D) that renders the Petition timely filed.

### B. Equitable Tolling

The limitation period may also be subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010); *Harris*, 209 F.3d at 329–30. Adams does not offer any specific arguments in favor of equitable tolling, and the Court does not find that he is entitled to equitable tolling of the limitations period.

The Fourth Circuit has consistently held that a party seeking to avail itself of equitable tolling must show that "(1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) prevented him from filing on time." *Rouse v. Lee,* 339 F.3d 238, 246 (4th Cir. 2003) (en banc). Further, to be entitled to equitable tolling, a habeas petitioner must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (internal quotation marks omitted); *see also Harris,* 209 F.3d at 330 (stating that "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent" and "reserved for

---

[3] For the reasons discussed below, even if Adams's six *Brady* claims were timely filed, on the merits they provide him no relief.

those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result."). In certain circumstances, facts that support a *Brady* claim might also support the application of the doctrine of equitable tolling. *Wardlaw v. Cain*, 541 F. 3d 275, 279 (5th Cir. 2008). This is not such a case.

Principally, Adams cannot demonstrate that circumstances beyond his control prevented his discovery of the information in the police file. *See, e.g.*, *Smith v. Clarke*, No. 15-cv-248, 2016 WL 8468177, at *7 (E.D. Va. Dec. 19, 2016) (recommending rejection of claim for equitable tolling where petitioner argued that police report was not available because documents were in existence in police file and available by state FOIA request, and if petitioner "had exercised 'reasonable diligence,' could have promptly discovered the documents and filed an appropriate habeas petition") (internal citation omitted), *rpt. & rec. adopted*, 2017 WL 958106 (E.D. Va. Mar. 10, 2017).

Further, as previously discussed, Adams has not demonstrated that he pursued his rights diligently in seeking the information discovered via his MPIA request. Although "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence," *Holland,* 560 U.S. at 653 (internal citations and quotation marks omitted), the Court cannot find that Adams acted with reasonable diligence. Adams's conviction became final in June of 2006, and the statute of limitations for filing a federal habeas petition regarding his case expired in June of 2007. He did not seek the police investigatory files until April of 2009 and did not file his federal Petition until 2018, almost eleven years after the statute of limitations expired. Moreover, Adams has offered no explanation for either of these delays. Therefore, the Court concludes that Adams is not entitled to equitable tolling.

24

C. **Actual Innocence**

As noted, Respondents argue that since the petition is statutorily time-barred, and Adams has offered no basis for equitable tolling, the petition should be dismissed. Adams asks that the Court consider his claims notwithstanding their late filing, on the basis that he has demonstrated actual innocence which serves as a gateway through which his untimely petition may be considered.  ECF No. 8; ECF No. 9. Respondents contend that Adams has failed to make the requisite showing of actual innocence. ECF No. 11 at 12. The Court agrees.

The "miscarriage of justice" exception to the statute of limitations allows that where a petitioner proffers newly discovered evidence that demonstrates it is "'more likely than not that no reasonable juror would have convicted him in the light of the new evidence[,]'" the habeas petition may proceed even though it would otherwise be statutorily time-barred. *Perkins*, 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 327); *see also United States v. Jones*, 758 F.3d. 579, 583 (4th Cir. 2014). "'This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons.'" *Perkins*, 569 U.S. at 392 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). The *Perkins* decision did not create a new right to habeas review, nor did it change existing law. Rather, it simply clarified the "actual innocence" standard as a gateway to habeas corpus review.

The Supreme Court "caution[ed], however, that tenable actual-innocence gateway claims are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror acting reasonably would have voted to find him guilty beyond a reasonable doubt.'" *Perkins*, 569 U.S. at 386 (brackets omitted) (quoting *Schlup v. Delo,* 513 U.S. at 329); *see also House v. Bell*, 547 U.S. 518, 538 (2006) ("[T]he Schlup

standard is demanding and permits review only in the extraordinary case.") (internal quotation marks omitted); *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) ("Claims of actual innocence ... should not be granted casually.") (internal citations omitted).

"[A]ctual innocence for the purposes of *Schlup* is a procedural mechanism rather than a substantive claim." *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012). In order to present a credible claim of actual innocence, Adams must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." *Schlup* 513 U.S at 324. Whether a petitioner has satisfied the miscarriage of justice exception requires the reviewing court to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks omitted). The new evidence must be evaluated with any other admissible evidence of guilt. *Wilson,* 155 F.3d at 404–05. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316.

"Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. "At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. Instead, "the district court must determine whether 'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" *Teleguz*, 689 F.3d at 328 (quoting *Schlup*, 513 U.S. at 327). The actual innocence determination "requires a holistic judgment about all the evidence and its likely effect

on reasonable jurors applying the reasonable-doubt standard." *Bell*, 547 U.S. at 539 (internal

citations and quotations omitted); *see also Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019).

In reviewing the total evidentiary record, the Court must "make a probabilistic determination

about what reasonable, properly instructed jurors would do. The court's function is not to make

an independent factual determination about what likely occurred, but rather to assess the likely

impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538 (internal citations and

quotations omitted).

Adams thus must "demonstrate that the totality of the evidence would prevent any

reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration

is a miscarriage of justice." *Teleguz*, 689 F.3d at 329 (internal citations omitted). Only if Adams

passes through the *Schlup* gateway by satisfying this standard can the Court consider and reach

the merits of Adams's claims.

The new evidence proffered by Adams is a far cry from the type of new evidence courts

have found sufficient to satisfy the actual innocence standard. Courts found that this gateway

standard was met when "the petitioner has made a credible and compelling showing of his actual

innocence," *Rivas v. Fischer*, 687 F.3d 514, 552 (2d Cir. 2012), such as where a petitioner

provides: (1) new DNA evidence and expert testimony "call[ing] into question" the "central

forensic proof connecting [the petitioner] to the crime," *as well as* "substantial evidence pointing

to a different suspect," *House*, 547 U.S. at 554 (emphasis added); (2) "sworn statements of

several eyewitnesses that [the petitioner] was not involved in the crime" *and* affidavits "that cast

doubt on whether [the petitioner] could have participated" in the offense, *Schlup*, 513 U.S. at 331

(emphasis added); (3) a third party's consistent and repeated statement that they committed the

offense, *Jones v. McKee*, 2010 WL 3522947, at *9–I0 (N.D. Ill. Sept. 2, 2010); *Carringer v.*

*Stewart,* 132 F.3d 463, 478–79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set-up the petitioner); or (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and five affidavits from individuals stating that the petitioner was outside the country at the precise time of the offense, *see Garcia v. Portuondo*, 334 F. Supp. 2d 446, 452–56 (S.D.N.Y. 2004). *See generally Schlup*, 513 U.S. at 324 (explaining that examples of sufficient new reliable evidence for a gateway claim include "exculpatory evidence, trustworthy eyewitness accounts, or critical physical evidence").

Adams has failed to make the requisite showing under *Perkins* and *Schlup* to warrant application of the miscarriage of justice exception to the statute of limitations bar. He fails to demonstrate that it is more likely than not that "the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt." *Teleguz* 689 F.3d at 329. After analyzing the pertinent evidence presented at trial and as summarized below, the value of Adams's new evidence, and the mix of all of the evidence introduced at trial, Adams's proffered "newly discovered evidence" is insufficient to meet the demanding actual innocence standard. Specifically, it does not qualify as "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup,* 513 U.S. at 316.

Respondents contend that the evidence is not new and that Wilkerson's shifting account regarding the events on the night of the murder undermines the credibility of the affidavit. *See* ECF No. 11 at 29, 33. Additionally, they argue that Adams has failed to show that "it is more

likely than not" that no reasonable juror would have convicted him in the light of the new evidence.  *Id.* at 31.  The Court agrees.

In *Perkins*, a case procedurally similar to Adams's, the victim was found stabbed to death after leaving a party with Floyd Perkins and another man, Damarr Jones. 569 U.S. at 387.  Jones, the key witness, testified that Perkins alone committed the murder while Jones observed.  *Id*. at 388. Chauncey Vaughn, a friend of both Perkins and the victim, testified that before the murder Perkins told him he would kill the victim and that later Perkins called him and confessed to the murder. *Id*. Another witness, Torriano Player, also a friend of Perkins and the victim, testified that Perkins told him that if he knew how Player felt about the victim, he would not have killed him. *Id*. Perkins testified that he left Jones and the victim during the evening and later saw Jones with blood on his clothing. Perkins was convicted of first-degree murder in 1993. *Id.* at 388. In 2008, over 11 years after his conviction, Perkins sought federal habeas relief, claiming newly discovered evidence of actual innocence. *Id.* at 389. He provided three affidavits, each pointing to Jones as the murderer, the most recent dated six years before the filing of his habeas petition. *Id.*

The first affidavit, dated in 1997, was from Perkins's sister who stated that she heard a third person say that Jones had bragged about stabbing the victim and taking his clothes to the cleaners after the murder. *Id.* The second affidavit, dated 1999, was from Demond Louis, Vaughn's younger brother who stated that Jones confessed to him that he had killed the victim. Louis also described the bloodstained clothes worn by Jones that night and that the following day he went with Jones to throw out the bloodstained shoes in a dumpster and take the clothing to a cleaner. *Id*. The third affidavit, dated 2002, was provided by an employee of Pro-Clean Cleaners who stated that on or about the day after the murder, a man matching Jones's description came to

29

the store and asked whether bloodstains could be removed from the pants and shirt he brought in. The pants and shirt, which she described, were heavily stained with blood. *Id*.

The district court rejected Perkins's actual innocence claim, finding that Perkins's newly discovered evidence—the evidence contained in the affidavits—was not newly discovered as the information was substantially available to Perkins at trial. *Perkins*, 569 U.S. at 400. The district court further held that even if the evidence could be considered new, it was nevertheless inadequate to show that had it been presented at trial, no reasonable juror would have convicted Perkins. *Id*. at 401. In remanding the case to the Court of Appeals, the *Perkins* Court noted, "On remand, the District Court's appraisal of Perkins' petition as insufficient to meet *Schlup's* actual-innocence standard should be dispositive, absent cause, which we do not currently see, for the Sixth Circuit to upset that evaluation. We stress once again that the *Schlup* standard is demanding." *Id*.

On remand, the district court again found that the evidence was not new given that petitioner had the evidence at the time of trial and further found that the evidence did not demonstrate that no reasonable jury would have convicted Perkins had the evidence been presented at trial. *Perkins v. McQuiggin*, 2013 WL 4776285, at *3 (W.D. Mich. Sept. 4, 2013).

Like the "new" evidence offered in *Perkins*, Adams's proffered evidence is not "new." It was available either at the time of trial or during the hearing on his motion for a new trial. Wilkerson's allegation that he was threatened by Detective Phelps and Assistant State's Attorney Rangoussis was presented and rejected during Adams's motion for a new trial. Further, at the time of trial, Adams had knowledge of Wilkerson's testimony and his effort to retract his identification of Adams as the shooter. The trial court discredited Wilkerson's testimony at trial and at the motion for a new trial, findings of fact which are presumptively correct under 28

30

U.S.C. § 2254(e)(1). Adams has not presented clear and convincing evidence that the state

court's findings were clearly erroneous and thus they cannot be disturbed. *See Teleguz*, 689 F.3d

at 331. Further, Wilkerson's claim in his affidavit that Adams was not the shooter is also not new

evidence in that Wilkerson attempted to recant his identification of Adams as the shooter during

the trial, claiming that the shooter was masked and that he did not know if Adams was the

shooter. ECF No. 11-2 at 55.

There are only two possible "new" pieces of information in the Affidavit, and neither

meets the high demands required of Adams. First, Wilkerson identifies Darrell Powell as the

shooter in his Affidavit. *See* ECF No. 9-1 at 1. This averment contradicts not only Wilkerson's

sworn statements to police and trial testimony that Adams was the shooter but also contradicts

his efforts to recant his identification of Adams when he claimed at trial that he could not

identify the shooter because the shooter was masked. ECF No. 11-2 at 55. The other arguably

"new" information contained in Wilkerson's affidavit is that Adams was not at the scene on the

night of the shooting and that the victim "appeared to be buying drugs" from an "unknown drug

dealer." ECF No. 9-1 at 1. Again, this information contradicts Wilkerson's testimony to the

police and at trial that the victim ripped off Adams by giving him fake money and that Adams

left the corner stating he was going to get his gun and would be back. ECF No. 11-2 at 36–40,

96–97. Adams also fails to explain why the proffered evidence could not have been found earlier

in time for trial or in time to file a motion for a new trial under state law.

While the Court has doubts whether Adams's evidence in support of his actual innocence

gateway claim is "new," even assuming he satisfied the first step of the *Perkins-Schlup* inquiry,

he nevertheless has failed to establish that the proffered evidence is reliable or that no reasonable

juror would have found him guilty beyond a reasonable doubt in light of the affidavits.

Adams's defense at trial was that he was not the shooter and he offered alibi witnesses to support his defense that he was not even present at the shooting. Evidence in support of an actual innocence claim must portray "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). This Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell,* 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup,* 513 U.S. at 327–28). In making such a determination, the Court may examine the timing of the declarations and the credibility that the affiants would have in weighing the reliability of the evidence. *Schlup,* 513 U.S. at 329, 332; *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding affidavits submitted eight years after trial suspect in light of lack of satisfactory explanation for the delay); *see also Herrera,* 506 U.S. at 423 (O'Connor, J., concurring) (stating that affidavits collected ten years after the petitioner was convicted on "seemingly dispositive evidence" alleging actual innocence are not uncommon. But, "[e]xperience has shown, however, that such affidavits are to be treated with a fair degree of skepticism.").

 "[A] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." *Perkins*, 569 U.S. at 387. In making such an assessment "the timing of the submission" and the "likely credibility of [a petitioner's] affiant" are factors bearing on the "reliability of th[e] evidence" purporting to show actual innocence.  *Id.* at 399 (quoting *Schlup,* 513 U.S. at 332). "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing. Taking account of the delay in the context of the merits of a petitioner's actual-innocence claim, rather than treating timeliness as a threshold inquiry, is tuned to the exception's

underlying rationale of ensuring 'that federal constitutional errors do not result in the incarceration of innocent persons.'" *Perkins* at 385 (internal quotations and citations omitted).

Wilkerson's Affidavit lacks trustworthiness not only because of Wilkerson's shifting accounts of events on the night of the shooting but because it was procured without the benefit of cross-examination and the opportunity to determine the credibility of his most recent account of the shooting. Additionally, the Affidavit is suspect in that it was obtained over 20 years after Wilkerson's initial statement to police and subsequent testimony, without any explanation. Wilkerson does not explain why he waited so long, after Adams's conviction and appeals had expired, to make his latest statement. *See also Taylor v. Illinois,* 484 U.S. 400, 414 (1988) ("It is ... reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed.").

Noteworthy here is the fact that Wilkerson's testimony at Adams's hearing on his motion for new trial occurred after Wilkerson had been sentenced for his then pending charges and he was therefore no longer under any threat of the mandatory 25 years of incarceration. Nevertheless, during that testimony, Wilkerson did not claim that Adams was not at the scene of the shooting or that "Darrell Powell" was actually the shooter.

The Affidavit falls short of demonstrating actual innocence. First, the Affidavit's reliability is questionable given Wilkerson's shifting accounts of the shooting, which diminish his credibility. The Affidavit is also of limited probative value. Substantially all of the information in the Affidavit was presented at trial, and the jury was able to then weigh Wilkerson's credibility during his testimony against his shifting accounts and the other evidence offered at trial. Had the additional evidence contained in the Affidavit been presented to the jury, the jury could have weighed its effect against the evidence offered by the State before returning

33

its verdict. But coming so long after Adams's trial, the offered demonstration of innocence falls

short. In addition, the proof of Adams's guilt at trial—including testimony that corroborated both

Wilkerson's initial account of the shooting and forensic evidence obtained from the crime scene,

learned from Adams's confession to Jarrett—pointed heavily to Adams's guilt. The Affidavit

evidence does not cast doubt on that conclusion. *See, e.g.*, *Blackmon v. Williams*, 823 F.3d 1088,

1101–02 (7th Cir. 2016) (rejecting an actual innocence claim where, eight years after trial,

witnesses claimed that the petitioner was not the shooter in light of the time delay and the

witness statements that did identify the petitioner as the shooter).

The "more likely than not" standard requires a petitioner "to make a stronger showing

than that needed to establish prejudice," but "imposes a lower burden than [a] clear and

convincing standard." *Schlup*, 513 U.S. at 327 (citation omitted). This "standard thus ensures

that petitioner's case is truly extraordinary, while still providing petitioner a meaningful avenue

by which to avoid a manifest injustice. Additionally, the word 'reasonable' in the required

gateway showing for actual innocence 'is not without meaning.'" *Id*. at 329. "It must be

presumed that a reasonable juror would consider fairly all of the evidence presented" and "that

such a juror would conscientiously obey the instructions of the trial court requiring proof beyond

a reasonable doubt." *Id.*

Adams's situation does not present the extraordinary case where it is more likely than not

that no reasonable juror would have convicted him in light of the affidavit. This Court recognizes

the weaknesses in the State's case against Adams, including the lack of physical evidence that

tied him to the murder and Wilkerson's conflicting accounts. But to counter, the State had

evidence of motive: that Piche had shorted Adams in the drug transaction and Piche, intoxicated,

returned to the area, which gave Adams the opportunity to get a gun to settle the score. Moreover, Adams confessed to the killing to Jarrett.

Thus, given the staleness of the declaration, the lack of information provided within the affidavit in support of his claim of actual innocence, and Wilkerson's shifting claims, weighed against the other evidence adduced at trial, it is improbable that a reasonable juror would not have convicted Adams in light of this evidence.

Nor is Adams entitled to an evidentiary hearing to develop his actual innocence claim. In evaluating a request for an evidentiary hearing, a district court "should consider the particular facts raised by the petitioner in support of his actual innocence claim." *Teleguz,* 689 F.3d at 331. Adams has not raised any facts that would entitle him to further exploration of his actual innocence claim.  In the absence of clear and convincing evidence, it would be improper for the Court to second-guess the state court's findings. *Cf. Teleguz,* 689 F.3d at 331 ("[T]he district court is permitted under *Schlup* to make some credibility assessments when . . . a state court has not evaluated the reliability of a petitioner's newly presented evidence that may indeed call into question the credibility of the witnesses presented at trial." (internal quotation marks and alterations omitted). For the reasons discussed above, it is not more likely than not that no reasonable juror would have convicted Adams.

In light of the foregoing and a "holistic determination of how a reasonable juror would perceive all of the evidence in the record," the Court does not find that "a reasonable juror would more than likely have a reasonable doubt" as required. *Teleguz*, 689 F.3d at 330. Adams fails to show that upon review of all the evidence, a reasonable juror would be prevented from finding him guilty beyond a reasonable doubt. Because the affidavit is neither reliable nor credible, and because Adams fails to explain the delay in presenting this evidence, the Court finds that he

35

has not met the threshold requirements necessary for the Court to consider the merits of his time-barred petition.

**V.      Merits Review of Brady Claims**

Nevertheless, even if the Court determined that Adams was entitled to have his six *Brady* claims reviewed on the merits because they were timely filed using 28 U.S.C. § 2244(d)(1)(D) as the starting date for computation of the statute of limitations, his claims would fail.

This Court may grant a petition for a writ of habeas corpus only to address violations of the United States Constitution or laws of the United States.28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 1 (2010); *Larry v. Branker*, 552 F.3d 356, 368 (4th Cir. 2009) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). In reviewing the decisions of the post-conviction court, this Court must give "considerable deference to the state court decision," and may not grant habeas relief unless the state court arrived at a "'decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Nicolas v. Att'y Gen. of Md.*, 820 F.3d 124, 129 (4th Cir. 2016) (quoting 28 U.S.C. § 2254(d)). Further, this Court "must presume that the state court's factual findings are correct unless the petitioner rebuts those facts by clear and convincing evidence," and "cannot disturb the state court's ruling simply because it is incorrect; it must also be unreasonable." *Id.*

For a state court's decision to be contrary to established federal law, the state court must have arrived at a conclusion contrary to the United States Supreme Court on a question of law or must have confronted facts that are "materially indistinguishable from a relevant Supreme Court" case but nevertheless arrived at the opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005); *Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014). As to an unreasonable determination, a federal court "'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.'" *Lovitt*, 403 F.3d at 178 (quoting *Williams*, 529 U.S. at 411). Rather, the Petitioner must show that the state court's ruling was "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Barnes*, 751 F.3d at 238 (quoting *White v. Woodall*, 572 U.S. 415, 419–20 (2014)). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, 135 S. Ct. 2187, 2202 (2015) (internal marks and citations omitted).

Adams received the response to his MPIA while his state post-conviction petition was pending and amended the petition to include Brady claims. ECF No. 11-1 at 30–32. Hearings on the post-conviction petition were held, and Adams presented Wilkerson's testimony, as well as an affidavit from his trial counsel that he did not see key documents from the police file until July 2010. *Id.* at 62. Counsel argued that, had he been given access to certain police files, he would have made several different decisions. First, had counsel known that Wilkerson's mother worked with the victim, he would have cross-examined Wilkerson regarding how long and well

he knew the victim. *See* ECF No. 1-8 at 1. Counsel also would have argued to the jury that Wilkerson was likely the victim's drug dealer and knew when the victim was paid and that the victim had a large amount of cash on him. *Id.* Counsel would have also used testimony from Mary Dunn, Piche's girlfriend, as corroboration that the victim had a large sum of money on him and would not have needed to rip off Adams, contrary to the State's position. *Id.* at 2. Additionally, counsel would have investigated Eugene Cartwright, a potential witness, to determine what he witnessed. *Id.* Adams also alleges *Brady* violations in that the State did not turn over information from Thomas Smith, another potential witness, that information was received from another source that the victim "flashed a big roll of money" before being shot by two men, and that two men named "Rodney and Fred" also witnessed the homicide. *See* ECF 1 at 7–9.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In order to prevail on a *Brady* claim, it must be established that the evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial. *Id*. at 678. The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).

The post-conviction court properly stated the law regarding *Brady* claims, thoroughly reviewed each of Adams's allegations of undisclosed evidence, and rejected each of his

contentions.  *See* ECF No. 11-1 at 76. Overall, the court found that most of the undisclosed material contained multiple layers of hearsay, varied from the State's account of the homicide only in minor ways, and often involved unidentified witnesses who needed to be located and whose testimony would need to be further developed. Therefore, Adams could not show beyond speculation that the item would be helpful or have diminish confidence in the trial outcome. *See id.* at 61–76.

First, the court correctly identified that the information from Thomas Smith, whose "information about the crime came from an unidentified friend, who may have been a witness," ECF No. 11-1 at 63, and who was "very reluctant" to come forward, *id.* at 65, was both of questionable reliability, given the layers of hearsay, and would not be "helpful in any substantial way." *Id.* Even assuming Smith's account of seeing two men running away from the scene would have just presented "at most minor inconsistencies" and may have even "reinforced the evidence" against Adams. *Id.* at 65–66. Second, as correctly noted by the post-conviction court, police notes from an unidentified source that Piche had a roll of cash and was subsequently shot by two men also suffers from the same issues with reliability and questionable value to Adams's case. *Id.* at 66. Similarly, police notes about "Rodney and Fred" suffer from multiple layers of hearsay, as the information was given to Detective Phelps by a woman, *id.* at 69, and, further, Adams did not identify any way in that he could locate any of these people to develop admissible testimony, *id.* at 70. Next, the court correctly noted that Detective Phelps's conversation with Mary Dunn did not suffer from the same issues with admissibility and locating the witness; however, her statement, had she testified consistently with it at trial, was that Piche had a drug habit and was nervous, which was consistent with the State's case. *Id.* at 71. In addition, her testimony that Piche had a large amount of money and thus had no reason to cheat a drug dealer

is "too remote and speculative" to put the State's theory to rest. *Id.* As the court noted, "a jury might take from Dunn's testimony that Piche was embarking on heavy drug and alcohol use that day. Or Piche might have used fake money simply to save the $1,000 for a different purpose." *Id.* at 72.

The post-conviction court also dismissed Adams's claims that he was entitled to know that Wilkerson's mother may have worked with Piche. ECF No. 11-1 at 73. Adams claims that because Wilkerson's mother knew Piche, then Wilkerson could be established as Piche's regular drug dealer—and not Adams himself. *Id.* As the court noted, the "argument is wholly speculation. The fact that Wilkerson had some familiarity with Piche through Wilkerson's mother does not support the leap to a conclusion that Wilkerson was Piche's regular supplier of drugs." *Id.* This "innocuous bit of information … would be insufficient to cast any shadow over the outcome of the trial." *Id.*

Finally, the post-conviction court found that Adam was not entitled to know the name of another potential witness, Eugene Cartwright. ECF No. 11-1 at 75. Cartwright was identified only as a "possible witness" and there was no indication that he actually had witnessed the homicide or what he may say. *Id.*

The Court must credit the post-conviction court's findings as presumptively correct. *See Nicolas*, 820 F.3d at 129. Adams has failed to carry the heavy burden of demonstrating that the post-conviction court's decision regarding the *Brady* claims is contrary to, or an unreasonable application of, clearly established federal law, or that it is rooted in an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d)(1)-(2). Therefore, even if these claims were not time-barred, they offer Adams no relief. Adams has simply provided no basis for this Court to find habeas relief is warranted.

**Certificate of Appealability**

When a district court dismisses a habeas petition, a Certificate of Appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner satisfies the standard by demonstrating that "jurists of reason could disagree with the district court's resolution of [the] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773–74 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). When a petition is denied on procedural grounds, the petitioner meets the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because Adams fails to satisfy these standards, the Court declines to issue a Certificate of Appealability. Adams may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003).

A separate Order follows.

__9/29/2021_____                    /s/_____
Date                                         GEORGE J. HAZEL
                                             UNITED STATES DISTRICT JUDGE